**AIMCEE WHOLESALE CORP., W. J. Byrnes & Co. of N. Y., Inc., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**C. D. 4186; Protest 64/6295–11982–62.**

United States Customs Court, Second Division.
March 12, 1971.

Barnes, Richardson & Colburn, New York City (E. Thomas Honey, J. Bradley Colburn, Norman C. Schwartz, New York City, of counsel), for plaintiffs.

L. Patrick Gray, III, Asst. Atty. Gen. (Harold L. Grossman, New York City, trial attorney), for defendant.

Lamb & Lerch, New York City (David A. Golden & Richard J. Kaplan, New York City, of counsel), as amici curiae.

Before RAO, FORD and NEWMAN, Judges.

NEWMAN, Judge:

Plaintiffs protest the rate of duty imposed by the collector of customs at the port of New York on certain bicycles imported from England on June 6, 1961. These bicycles are the so-called large-wheel lightweight type, viz., with wheels over 25 inches in diameter, weighing less than 36 pounds complete without accessories, and not designed for use with tires having a cross-sectional diameter exceeding $1\frac{5}{8}$ inches.

The shipment in question was assessed at the rate of $11\frac{1}{4}$ per centum ad valorem under paragraph 371 of the Tariff Act of 1930, as modified by Presidential Proclamation No. 3394, dated February

25, 1961, T.D. 55328. The latter proclamation increased the rate for the type of bicycles imported from 7½ percent, provided for under paragraph 371, as modified by the General Agreement on Tariffs and Trade (GATT), 82 Treas. Dec. 305, T.D. 51802.

Plaintiffs do not controvert the collector's classification of the bicycles under paragraph 371; but rather, assail the 11¼ per centum rate of duty, contending that the President's proclamation increasing the rate from 7½ percent to 11¼ percent is void, and the legal rate is that set forth in the GATT.[1]

Plaintiffs assert two alternative grounds for their claim that Proclamation 3394 is invalid:

First, that the proclamation "purports to establish 'escape clause' rates of duty in a manner not authorized by the then-governing statute, section 7 of the Trade Agreements Extension Act of 1951 as amended." [2]

Second, that "the proclamation is invalid for failure to include therein the factual finding required by section 350 of the Tariff Act of 1930 as amended [3] * * * that existing duties or other import restrictions of the United States are unduly burdening and restricting foreign trade and that the statutory purposes will be promoted by the proclaimed duty change."

The Government's position is that the rates of duty in Proclamation 3394 are based on a trade agreement with the United Kingdom, Germany, Belgium, the Netherlands, Luxemburg and Austria entered into by the President in full compliance with section 350 of the Tariff Act of 1930 (as amended) and the "peril point" procedures set forth in section 3 of the Trade Agreements Extension Act of 1951 (as amended); and that the President was not required to comply with the "escape clause" procedures in section 7 of the Trade Agreements Extension Act of 1951.

After careful consideration of the record and the excellent briefs filed by counsel for the respective parties and by *amici curiae* on behalf of the domestic manufacturers of bicycles, we have concluded that Presidential Proclamation 3394 is valid and that the collector assessed the proper rate of duty. Accordingly, the protest is overruled.

## PRESIDENTIAL PROCLAMATION 3394

The proclamation, in pertinent part, provides:

1. WHEREAS, pursuant to the authority vested in him by the Constitution and the statutes, including section 350 of the Tariff Act of 1930, as amended (19 U.S.C. 1351), the President, on October 30, 1947, entered into a trade agreement with certain foreign countries, which consists of the General Agreement on Tariffs and Trade, including a schedule of United States concessions * * *, and by Proclamation No. 2761 A of December 16, 1947 (61 Stat. (pt. 2) 1103), proclaimed such modifications of existing duties * * * as were then found to be required or appropriate to carry out such trade agreement * * *;

2. WHEREAS United States tariff concessions on bicycles provided for in paragraph 371 of the Tariff Act of 1930 were included in such trade agreement, such concessions * * *, being * * * as follows: (setting forth old rate of duty claimed herein by plaintiffs) * * *.

3. WHEREAS Article XXVIII of the said General Agreement on Tariffs and Trade (8 UST (pt. 2) 1790) provides that a contracting party may, pursuant to procedures provided for therein, modify or withdraw concessions in its schedules to that agreement;

4. WHEREAS due notice of intention to enter into negotiations under

---

1. $1.25 each, but not less than 7½ percent nor more than 15 percent ad val.

2. 19 U.S.C. § 1364.

3. 19 U.S.C. § 1351.

the said Article XXVIII with a view to the modification or withdrawal of the concessions represented by item 371 [first] in Part I of Schedule XX–1947 was given, and the views presented by interested persons were received and considered, and information and advice with respect to such negotiations were sought from the Departments of State, Agriculture, Commerce, and Defense and from other sources, and an investigation and report to the President under the provisions of section 3 of the Trade Agreements Extension Act of 1951, as amended (19 U.S.C. 1360), have been made by the United States Tariff Commission with respect to the products involved in such negotiations;

5. WHEREAS, agreement for the modification of the said concessions in the manner set forth below in this recital having been reached pursuant to Article XXVIII of the said General Agreement, I determine that it is required or appropriate in order to carry out the agreement specified in the first recital hereof that Part I of Schedule XX–1947 be applied as though the said item 371 [first] and the appropriate headings read as follows: (setting forth new rate of duty as assessed in the present case) * *

6. WHEREAS a proclaiming of the application of Part I of Schedule XX–1947 as set forth in the fifth recital of this proclamation would supersede Proclamation No. 3108 of August 18, 1955 (70 Stat. C 4), relating to such concessions;

\* \* \* \* \* \*

NOW, THEREFORE, I, JOHN F. KENNEDY, President of the United States of America, acting under the authority of the Constitution and statutes, including the said section 350 of the Tariff Act of 1930, as amended, do proclaim as follows:

### Part I

To the end that the trade agreements referred to in the foregoing recitals may be carried out:

(a) Effective at 5 P.M. on the day following the date hereof, at the respective ports of entry, Proclamation No. 3108 of August 18, 1955, referred to in the sixth recital of this proclamation is terminated;

(b) Effective at the opening of the Customs House, at the respective ports of entry, on the second day following the date hereof, Part I in Schedule XX–1947 shall be applied as though item 371 [first] therein read as set forth in the fifth recital of this proclamation;

\* \* \* \* \* \*

### STATUTES

Proclamation 3394 was issued pursuant to section 350 of the Tariff Act of 1930, as amended (19 U.S.C. § 1351), and provides:

(a) (1) For the purpose of expanding foreign markets for the products of the United States (as a means of assisting in establishing and maintaining a better relationship among various branches of American agriculture, industry, mining, and commerce) by regulating the admission of foreign goods into the United States in accordance with the characteristics and needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—

(A) To enter into foreign trade agreements with foreign governments or instrumentalities thereof: *Provided,* That the enactment of the

Trade Agreements Extension Act of 1955 shall not be construed to determine or indicate the approval or disapproval by the Congress of the executive agreement known as the General Agreement on Tariffs and Trade.

(B) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder.

* * * * * *

Section 3 of the Trade Agreements Extension Act of 1951, as amended (19 U.S.C. § 1360), referred to in the fourth recital of Proclamation 3394, reads so far as pertinent:

(a) Before entering into negotiations concerning any proposed foreign trade agreement under section 1351 of this title, the President shall furnish the United States Tariff Commission (hereinafter in sections 1352(a), (c), 1354, and 1360–1367 of this title, and section 624(b) of Title 7, referred to as the "Commission") with a list of all articles imported into the United States to be considered for possible modification of duties and other import restrictions, imposition of additional import restrictions, or continuance of existing customs or excise treatment. Upon receipt of such list the Commission shall make an investigation and report to the President the findings of the Commission with respect to each such article as to (1) the limit to which such modification, imposition, or continuance may be extended in order to carry out the purpose of said section without causing or threatening serious injury to the domestic industry producing like or directly competitive articles; and (2) if increases in duties or additional import restrictions are required to avoid serious injury to the domestic industry producing like or directly competitive articles the minimum increases in duties or additional import restrictions required. Such report shall be made by the Commission to the President not later than six months after the receipt of such list by the Commission. No such foreign trade agreement shall be entered into until the Commission has made its report to the President or until the expiration of the six-month period.

(b)(1) In the course of any investigation pursuant to this section the Commission shall hold hearings and give reasonable public notice thereof, and shall afford reasonable opportunity for parties interested to be present, to produce evidence, and to be heard at such hearings. If in the course of any such investigation the Commission shall find with respect to any article on the list upon which a tariff concession has been granted that an increase in duty or additional import restriction is required to avoid serious injury to the domestic industry producing like or directly competitive articles, the Commission shall promptly institute an investigation with respect to that article pursuant to section 1364 of this title.

The so-called "escape clause" provisions, section 7 of the Trade Agreements Extension Act of 1951, as amended by the Trade Agreements Extension Act of 1958 (19 U.S.C. § 1364), provides:

(a) Upon the request of the President, upon resolution of either House of Congress, upon resolution of either the Committee on Finance of the Senate or the Committee on Ways and Means of the House of Representatives, upon its own motion, or upon application of any interested party (including any organization or group of employees), the United States Tariff Commission shall promptly make an investigation and make a report thereon not later than [six months] after the application is made to determine

whether any product upon which a concession has been granted under a trade agreement is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported into the United States in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products.

In the course of any such investigation, whenever it finds evidence of serious injury or threat of serious injury or whenever so directed by resolution of either the Committee on Finance of the Senate or the Committee on Ways and Means of the House of Representatives, the Tariff Commission shall hold hearings giving reasonable public notice thereof and shall afford reasonable opportunity for interested parties to be present, to produce evidence, and to be heard at such hearings.

Should the Tariff Commission find, as the result of its investigation and hearings, that a product on which a concession has been granted is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products, it shall recommend to the President the withdrawal or modification of the concession, its suspension in whole or in part, or the establishment of import quotas, to the extent and for the time necessary to prevent or remedy such injury. The Tariff Commission shall immediately make public its findings and recommendations to the President, including any dissenting or separate findings and recommendations, and shall cause a summary thereof to be published in the Federal Register. * * *

\* \* \* \* \* \*

(c)(1) Upon receipt of the Tariff Commission's report of its investiga-

tion and hearings, the President may make such adjustments in the rates of duty, impose such quotas, or make such other modifications as are found and reported by the Commmision to be necessary to prevent or remedy serious injury to the respective domestic industry. If the President does not take such action within sixty days he shall immediately submit a report to the Committee on Ways and Means of the House and to the Committee on Finance of the Senate stating why he has not made such adjustments or modifications, or imposed such quotas.

\* \* \* \* \* \*

## GENERAL AGREEMENT ON TARIFFS AND TRADE-T.D. 51802

### Article XXVIII:

*Modification of Schedules*

1. On or after January 1, 1951, any contracting party may, by negotiation and agreement with any other contracting party with which such treatment was initially negotiated, and subject to consultation with such other contracting parties as the CONTRACTING PARTIES determine to have a substantial interest in such treatment, modify, or cease to apply, the treatment which it has agreed to accord under Article II to any product described in the appropriate Schedule annexed to this Agreement. In such negotiations and agreement, which may include provision for compensatory adjustment with respect to other products, the contracting parties concerned shall endeavour to maintain a general level of reciprocal and mutually advantageous concessions not less favourable to trade than that provided for in the present Agreement.

\* \* \* \* \* \*

### Article XIX:

*Emergency Action on Imports of Particular Products*

1. (a) If, as a result of unforeseen developments and of the effect of the obligations incurred by a contracting

party under this Agreement, including tariff concessions, any product is being imported into the territory of that contracting party in such increased quantities and under such conditions as to cause or threaten serious injury to domestic producers in that territory of like or directly competitive products, the contracting party shall be free, in respect of such product, and to the extent and for such time as may be necessary to prevent or remedy such injury, to suspend the obligation in whole or in part or to withdraw or modify the concession.

(b) If any product, which is the subject of a concession with respect to a preference, is being imported into the territory of a contracting party in the circumstances set forth in subparagraph (a) of this paragraph, so as to cause or threaten serious injury to domestic producers of like or directly competitive products in the territory of a contracting party which receives or received such preference, the importing contracting party shall be free, if that other contracting party so requests, to suspend the relevant obligation in whole or in part or to withdraw or modify the concession in respect of the product, to the extent and for such time as may be necessary to prevent or remedy such injury.

\*     \*     \*     \*     \*     \*

THE RECORD

The record consists of an oral stipulation of fact and six documentary exhibits introduced in evidence by plaintiffs. The stipulation and documents establish the following sequence of events:

1. On December 20, 1960 the President addressed a letter to the Chairman of the Tariff Commission (exhibit 1) stating that he had approved the issuance of a formal notice by the Interdepartmental Committee on Trade Agreements of the Government's intention "to invoke Article XXVIII of the General Agreement on Tariffs and Trade with a view to the withdrawal or modification of the tariff concessions granted by the United States in that agreement on bicycles \*   \*   \*," and requesting the Tariff Commission to "make an investigation and report to the President in accordance with the provisions of Section 3 of the Trade Agreements Extension Act of 1951, as amended," with respect to bicycles. The President explained his purpose in initiating these procedures, as follows:

On December 12, 1960, the Supreme Court denied a petition for certiorari in the case of United States v. Schmidt Pritchard and Company, [47 CCPA 152] (Treas.Dec. Vol. 95, No. 38, Sept. 22, 1960, p. 34; C.A.D. 750). This case invalidated one of the rates in Proclamation 3108 concerning bicycles and cast doubt upon the validity of the other three rates in that Proclamation and upon the rates in Proclation 3211 concerning spring clothespins. It is my intention to give consideration to entering into agreements with certain foreign countries in order to assure the application of the rates provided for in Proclamations 3108 and 3211.

In order to provide prompt assurance to the domestic industries of the protection intended by these proclamations, I would appreciate having the Commission's report at the earliest possible time.

2. On December 21, 1960 the Interdepartmental Committee on Trade Agreements issued a "Notice of Intention to Invoke Article XXVIII of the General Agreement on Tariffs and Trade with respect to United States Concessions on Bicycles \*   \*   \*" (exhibit 2), stating *inter alia:*

Such invocation of Article XXVIII is intended to result in rates equal to those provided for in Proclamation No. 3108 of August 18, 1955 \*   \*   \* the validity of which has been brought into question by the decision of the United States Court of Customs and Patent Appeals in United States v. Schmidt Pritchard and Company [47 CCPA 152] (C.A.D. 750). \*   \*   \*

This notice also stated that on December 21, 1960 the Tariff Commission had announced the holding of its public hearings in connection with its "peril point" investigations of bicycles "pursuant to Section 3 of the Trade Agreements Extension Act of 1951, as amended."

3. On December 21, 1960 the Committee for Reciprocity Information issued a notice (exhibit 3) referring to exhibit 2, and giving notice regarding the submission of views with respect to the proposed invocation of Article XXVIII.

4. On December 22, 1960 the Tariff Commission issued a notice (exhibit 4) referring specifically to exhibits 1 and 2 and noting that pursuant to section 3 of the Trade Agreements Extension Act of 1951, it had instituted an investigation relative to bicycles. The notice recites that the purpose of the investigation was to enable the Tariff Commission to obtain the facts necessary to formulate "peril point" findings for inclusion in a report to the President concerning bicycles, so that the President could take whatever action he deemed appropriate "in order to carry out the purpose of section 350 of the Tariff Act of 1930, as amended (Trade Agreements Act)." A public hearing in connection with the bicycle investigation was scheduled for January 7, 1961.

5. The hearing with respect to bicycles was held on January 7, 1961, as scheduled in the Tariff Commission's notice, and the Commission's "peril point" report to the President was submitted on January 10, 1961.

6. On February 25, 1961 the President issued Proclamation No. 3394 (exhibit 5), in which he recited that "agreement for the modification of the [1947 GATT] concessions" on bicycles had been reached pursuant to Article XXVIII, and he proclaimed rates identical with those previously set forth in Proclamation No. 3108, which proclamation was terminated by Proclamation 3394. An accompanying White House press release, dated February 25, 1961, states in part:

The President today issued a proclamation setting new tariff rates for bicycles. These rates were the product of an agreement which had been reached, after negotiations, with the United Kingdom, Germany, Belgium, the Netherlands, Luxemburg, and Austria.

The new rates are the same as those which were set forth in a proclamation issued August 19, 1955, following escape clause proceedings before the Tariff Commission. It was necessary to issue the new proclamation in order to remove the doubt cast on the validity of the earlier proclamation by a decision of the Court of Customs and Patent Appeals in the case of the United States vs Schmidt Pritchard and Company. The effect of the proclamation, therefore, is to resort the customs duty treatment contemplated in the original escape clause proclamation. The United States granted tariff concessions in 1956 to compensate for the increase in rates in the earlier proclamation, and no further compensatory concessions were made by the United States in the new negotiations.

The new rates for large wheel lightweight bicycles is [sic] $1.87½ each, but not less than 11¼ percent nor more than 22½ percent ad valorem. The range of ad valorem rates for all other bicycles is 22½ percent to 30 percent, with specific minimum rates of $3.75 each for large wheel bicycles weighing 36 pounds or more; $3 each for bicycles with wheels over 19 but not over 25 inches in diameter; and $1.87½ each for bicycles with wheels less than 19 inches in diameter. Each of these rates is 50 percent higher than the rates in the trade agreement concession which the United States made in the tariff negotiations at Geneva in 1947.

The foregoing summarizes the notices issued and proceedings held prior to the issuance of Proclamation 3394. In addition, a Department of State publication containing an analysis of United States

negotiations at the 1960–1961 tariff conference,[4] includes the following:

> * * * The United States also negotiated with four countries to meet a legal technicality concerning a previous negotiation on the rates of duty on bicycles. The increased rates on bicycles proclaimed in 1955 by the President following an escape clause investigation [Proclamation 3108] were invalidated by court decision. [United States v. Schmidt Pritchard & Co., Mangano Cycles Co., 47 CCPA 152, C.A.D. 750 (1960), cert. den. 364 U.S. 919 [81 S.Ct. 283, 5 L.Ed.2d 259] (1960).] In order to maintain the existing treatment, the United States, during this conference, negotiated identical rates under the procedures of Article XXVIII. The United States had paid compensation in 1956 for the original increase in rates and therefore no further compensation was requested for this permanent modification.

At the trial, counsel for the respective parties stipulated that (R. 12–13):

> 1. On January 7, 1961, hearings were held before the Tariff Commission[5] on bicycles under section 3 of the Trade Agreements Extension Act of 1951, as amended, the so-called "Peril Point" provision (19 U.S.C. of 1958 Ed., Section 1360).
>
> 2. Subsequent to the investigation referred to in Exhibit 4, and the hearings referred to in Paragraph 1 hereof which were held on January 7, 1961, no investigation was conducted with regard to bicycles by the Tariff Commission pursuant to Sections 3(b) and 7 of the Trade Agreements Extension Act of 1951, as amended (19 U.S.C. 1958 Ed., Sections 1360(b) and 1364) prior to the issuance of Presidential Proclamation 3394 dated February 25, 1961.
>
> 3. Prior to the issuance of Presidential Proclamation 3394 dated February 25, 1961, no other proceedings were held, nor were any notices given, under section 350 of the Tariff Act of 1930, as amended (19 U.S.C.1958 Ed., Section 1351) or the Trade Agreements Extension Act of 1951, as amended, with regard to bicycles, the subject of said Presidential Proclamation 3394, except those referred to in Exhibits 1 through 5 and paragraph 1 hereof.

## I.

Under section 350, as amended, the President is authorized to enter into foreign trade agreements and to proclaim modifications of existing duties within prescribed limits. In 1947, the President negotiated the GATT, the terms and provisions of which were proclaimed by Presidential Proclamation 2761A, T.D. 51802. The GATT became effective on January 1, 1948. Among the modifications specified in that agreement was a *decrease* in the existing rate of duty on bicycles of the type involved in the instant litigation.

The duty modifications in the GATT were made subject to certain terms, conditions and qualifications. For example, under Article XIX a contracting party may, under certain circumstances, unilaterally "escape" from the obligations incurred under the agreement and withdraw or suspend tariff concessions. Further, Article XXVIII of the GATT provides that on or after January 1, 1951, any contracting party may, "by negotiation and agreement," modify or terminate the treatment which it had agreed to accord to any product under the terms of the GATT, and that such negotiations may include provision for compensatory adjustment with respect to other products.

---

4. General Agreement on Tariffs and Trade, Analysis of United States Negotiations, Vol. II, 1960–61 Tariff Conference (Department of State Publication 7350, Commercial Policy Series 187, March 1962), at page 95.

5. Exhibit 6 is a certified copy of the Rules of Practice and Procedure of the Tariff Commission in effect as of the hearing date.

In *increasing* the rates of duty on bicycles in 1961 under Proclamation 3394, the President expressly invoked the authority of section 350 of the Tariff Act of 1930, as amended, and recited that the negotiations modifying the bicycle rates of duty were conducted pursuant to Article XXVIII of the GATT.

## II.

In sections 3 and 4 of the Trade Agreements Extension Act of 1951, Congress provided a so-called "peril point" procedure for the protection of domestic industry from imports when the President is contemplating the negotiation of a new trade agreement.[6] The substance of that procedure is explained in Senate Report No. 299 82nd Congress, 1st Sess., reporting on H.R. 1612:

> * * * It [peril point amendment] requires the President, before entering into any new trade agreements, to furnish to the Tariff Commission, a list of commodities upon which he intends to negotiate. Upon receipt of this list, the Tariff Commission is to make a study and finding, with regard to each respective commodity, of the point below which tariffs may not be reduced without serious injury or threat of serious injury to a domestic industry, and also of the point to which they should be increased to prevent such injury. Upon receipt of this report, or within 120 days [7] after furnishing the list to the Tariff Commission, the President may proceed to negotiate with foreign countries. If he reduces a rate of duty below the peril point found by the Tariff Commission, or fails to provide for the increase found by it to be necessary, he must report to the Congress his reasons for so doing. In such case the Tariff Commission must submit to the Congress the portion of it report to the President dealing with the articles on which its recommendations were not followed.

■ Other sections of the Trade Agreements Extension Act of 1951 which are intended by Congress to provide increased protection for domestic industry from imports are the so-called "escape clause" provisions, sections 6 and 7. Thus, section 6 provides in substance that an escape clause [8] shall be included in all future trade agreements, and that the President should as soon as practicable insert such escape clause in all such existing agreements; and section 7 sets out the procedures required for the taking of escape action. Defendant makes no contention that Proclamation 3394 complies with those procedures, but rather that the Proclamation complies with the peril point procedures.

## III.

■■ Initially, we shall reiterate the fundamental doctrine that "[n]o one has a legal right to the maintenance of an existing rate or duty." Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 318, 53 S.Ct. 350, 359, 77 L.Ed. 796 (1933). Further, it is well established that Congress may endow the President with power to *raise* or lower rates of duty provided he acts within the procedures authorized by Congress. J. W. Hampton, Jr., & Company v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.

---

6. Substantially similar provisions were included in the Trade Agreements Extension Act of 1948. 62 Stat. (part 1) 1053.

7. Section 4(a) of the Trade Agreements Extension Act of 1958 extended the time for the conduct of peril-point investigations by the Tariff Commission from 120 days to 6 months.

8. "The 'escape clause' is a clause inserted in trade agreements allowing parties to the agreement to escape from terms of the agreement which cause or threaten serious injury to domestic industry, which effect was unforeseen at the time of the agreement. The statutory procedure may be applied only in cases where the involved trade agreement contains such an 'escape clause'." United States v. Schmidt Pritchard & Co. et al., 47 CCPA 152, 159, C.A.D. 750 (1960), cert. den. 364 U.S. 919, 81 S.Ct. 283, 5 L.Ed.2d 259 (1960).

Ed. 624 (1928); Norwegian Nitrogen Products Co., *supra*.

■ The primary issue raised here is, in essence, whether under the circumstances delineated by the record, the President was required to invoke escape clause procedures as a condition precedent to increasing the rate of duty on bicycles, as urged by plaintiffs; or whether such increase was validly proclaimed by virtue of the President's negotiation of a trade agreement pursuant to section 350 (as amended) and Article XXVIII of GATT, as contended by defendant. There is no doubt this issue is justiciable. J. W. Hampton, Jr., *supra*; United States v. George S. Bush & Co., Inc., 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1940).

Plaintiffs heavily rely upon their interpretation of the phrase "or other escape action taken" in the following statement from Senate Finance Report No. 299, *supra*:

> It is the construction of this Committee that escape provisions resulting from sections 6(a) and 6(b), or other escape action taken, shall be administered under the procedures provided in Section 7 of this bill.

Plaintiffs argue that when the President invoked GATT Article XXVIII, he was taking such "other escape action" as was contemplated by the above quoted statement. Continuing, plaintiffs contend that Article XXVIII is a "type of escape-clause," and that by the phrase "other escape action" Congress meant "escape action based upon conditions specified in section 6(a) of the 1951 extension act,[9] sought to be accomplished through the invoking of a trade agreement clause other than an 'escape clause' contemplated by section 6."

■ In our opinion, the President's action in negotiating increased rates on bicycles pursuant to section 350 (as amended) and the reservation contained in Article XXVIII cannot be categorized as "escape action." We see nothing in the language of section 7 of the Trade Agreements Extension Act of 1951, nor in Senate Report No. 299, which should lead us to the conclusion that a trade agreement reservation such as Article XXVIII must be invoked pursuant to escape clause procedures.

■ We view an "escape action" as a procedure whereby the United States can *unilaterally* (without negotiation with its trading partners) withdraw, in whole or in part, a concession previously made in a foreign trade agreement. The statement in the Finance Committee Report was simply to the effect that any trade agreement escape clauses that were *not* the result of the directive set forth in section 6(a), viz. GATT Art. XIX, were also to be administered under the procedures in section 7. Stated differently, the Committee's statement was, in effect, that the procedures of section 7 should apply: (1) to escape clauses which resulted from the section 6 directive to include such a provision in all future trade agreements, and as soon as practicable, to insert such clauses in all existing trade agreements; and (2) to other escape action such as that provided for by Article XIX of the GATT, which predated and thus did not result from the section 6 directive.

Hence, "escape action" is to be distinguished from the procedures invoked by the President herein pursuant to section 350 (as amended) and Article XXVIII of the GATT which involved the *negotiation* of rates and the consent of the contracting parties.

9. 19 U.S.C. § 1363(a) provides: "No reduction in any rate of duty, or binding of any existing customs or excise treatment, or other concessions hereafter proclaimed under section 1351 of this title, shall be permitted to continue in effect when the product on which the concession has been granted is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported into the United States in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products."

A study of the statutes discussed *supra* convinces us that the President had two alternative procedures for increasing the rate of duty on bicycles: he could, of course, have invoked escape clause procedures without the necessity of negotiating such increases with other nations; or alternatively he could, as he did, negotiate the higher rates pursuant to his authority under section 350 (as amended) and Article XXVIII of the GATT.

## IV.

It is appropriate at this point to review the holding in United States v. Schmidt Pritchard & Co. et al., 47 CCPA 152, C.A.D. 750 (1960), cert. den., 364 U.S. 919, 81 S.Ct. 283, 5 L.Ed.2d 259 (1960), relied upon by plaintiffs.

In *Schmidt Pritchard,* the appellate court held that insofar as Presidential Proclamation 3108 set a rate of duty on one class of bicycles (large-wheel lightweights) different from that recommended by the Tariff Commission, the President exceeded his authority under the escape clause procedures of section 7, and accordingly that portion of the proclamation was void.

We find nothing in *Schmidt Pritchard* suggesting that the President must comply with escape clause procedures when his proclamation is based on *other* authority. In point of fact, our appellate court observed (47 CCPA at 160):

Counsel for appellant have suggested that the President could avoid the "escape-clause" proceedings under section 7 and accomplish the same end by negotiating new terms with foreign nations. This argument overlooks the necessity of involving the peril-point procedures of sections 3 and 4 of the Trade Agreements Extension Act of 1951, as amended. Subsections 3(a) (2) require a special investigation of articles over which there will be negotiations, and which require additional import restrictions to prevent or remedy serious injury to domestic indus-

try. Subsection 4(a) (2) requires the President to report to Congress, specifically identifying the articles subject to a subsection 3(a) (2) investigation, where the recommendations of the Tariff Commission have not been carried out, stating his reason for not carrying out the recommendations. Such a report would then open the way for "escape-clause" action to be initiated by Congress, or for such other actions as Congress deems appropriate.

Indeed, in a footnote to the *Schmidt Pritchard* opinion, the court stated (*id.* at 160):

\* \* \* [S]ection 7 establishes a particular proceeding for a particular purpose and does not affect any powers granted under other applicable statutes. The President, under section 7 is granted the right to proclaim any restriction within the limits set by Congress, or not to proclaim any new restriction at all. If anything else is done, it must be done according to some other statutory authorization and under the procedure there specified.

After *Schmidt Pritchard* became final in 1960, the President initiated the events disclosed by the record which culminated in Proclamation 3394. We emphasize that, in issuing such proclamation, the President expressly invoked the authority of section 350 (as amended), and specified that the negotiations modifying the bicycle rates of duty were conducted pursuant to Article XXVIII of the GATT. Unlike Presidential Proclamation 3108 involved in *Schmidt Pritchard,* Proclamation 3394 did not invoke the authority of section 7 of the Trade Agreements Extension Act, as amended, nor did it purport to effectuate an escape action pursuant to Article XIX of the GATT.

Proclamation 3394 does not, as plaintiffs strenuously argue, proclaim escape clause rates. Although the President intended to revive the rates on bicycles provided in Proclamation 3108,[10] the iden-

10. See the President's letter of December 20, 1960 to the Chairman of the Tariff Commission (exhibit 1).

tical rates in Proclamation 3394 cannot be regarded as escape clause rates. Article XXVIII of the GATT is not an escape clause, as is Article XIX. The fact that the President's reason for negotiating the trade agreement was to restore the same rates of duty set forth in Proclamation 3108 is not a basis for holding the new Proclamation to be invalid. As pointed up by *Bush, supra* (310 U.S. at 380, 60 S.Ct. at 946):

> For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains. Under the Constitution it is exclusively for Congress, or those to whom it delegates authority, to determine what tariffs shall be imposed.
> * * *

### V.

In support of their position, plaintiffs also point to the fact that the Trade Agreements Extension Act of 1958 (section 4(b)) amended section 3 of the Trade Agreements Extension Act of 1951 by directing the Tariff Commission promptly to institute an escape-clause investigation if, in the course of a peril point investigation, "the Commission shall find with respect to any article on the list upon which a tariff concession has been granted that an increase in duty or additional import restriction is required to avoid serious injury to the domestic industry producing like or directly competitive articles."

H.R.Rep. No. 1761 85th Cong., 2nd Sess., regarding the amendment of the peril point provisions, states at page 7:

> The bill also amends the peril-point provisions to direct the Tariff Commission, as the present legislation does not, to institute an escape-clause investigation automatically whenever it finds in a peril-point investigation that more restrictive customs treatment is required to avoid serious injury to the domestic industry producing like or directly competitive products. The purpose of this amendment is to provide for a more expeditious determination of whether escape-clause action is needed. Since in peril-point investigations, including hearings, attention is focused principally on the effect of possible decreases in rates of duty, it is appropriate to have a separate expeditious investigation based on the escape-clause criteria, before *escape-clause action* is taken increasing rates of duty.

> Under this new provision, whenever a majority of Tariff Commissioners, or half the Tariff Commissioners and the President, agree on a peril-point calling for increased tariff restrictions, an escape-clause investigation shall be instituted automatically. This assures that there may be no loss of time in proceeding toward a determination on a basis which will, if necessary permit action by the United States. *Although the President may still negotiate the indicated increases, together with compensatory adjustments, the possibility of escape-clause action, which international agreements permit without prior concurrence, will thus be assured, if needed, in the event agreement with another country on the increase proves impracticable.* (Emphasis added.)

Significantly, in commenting on this amendment during floor debate, Chairman Mills stated, 104 Cong.Rec. 10542:

> Another amendment to the peril-point procedure provides that in those instances where Tariff Commission finds—with respect to an item listed for possible trade agreement negotiation and on which there has previously been a concession made—that the existing rate of duty is not adequate to prevent or remedy serious injury, it shall immediately institute an investigation under the escape-clause without the delay that would presently be involved. This provision makes it clear that it is the escape clause that is the *principal* [11] vehicle for modifying existing concessions and for bringing in-

---

11. Thus, the escape clause is not the *sole* vehicle for increasing rates of duty.

to effect higher rates of duties where those are indicated after careful study has shown the threat or existence of serious injury due to imports. It would also remove the onerous responsibility of *having* to employ a trade agreement negotiation, which is designed to effect reductions in duties, as a means of bringing into effect higher rates of duty. (Emphasis added.)

Plaintiffs contend that the effect of section 4(b) was to "eliminate for all practical purposes" the President's authority to negotiate the instant increases in duty by a trade agreement. Plaintiffs argue that Congress did not intend to authorize the President to "circumvent the statutory escape-clause and to put into effect under GATT procedures escape-clause rates of duty as determined solely by the executive branch." But such contention overlooks the fact that Proclamation 3394 did not put into effect escape-clause rates determined solely by the President; rather the proclamation put into effect rates which were the result of negotiation and the concurrence of other affected nations.

The legislative history of section 4(b) reveals that the section was intended to afford increased protection to domestic industry by removing from such industry the burden of commencing an escape-clause action, if one proved necessary. Section 4(b) also provided an alternative to the President's "having to employ a trade negotiation" in order to effectuate increased rates of duty. The 1958 legislation clearly did not eliminate the President's authority to negotiate increases, as urged by plaintiffs. On the contrary, Congress provided for an expeditious alternative for the President in the event such negotiations proved impracticable. In 1961, negotiations were undoubtedly practicable and the President did, in fact, negotiate the increased duties with foreign countries, which duties he subsequently proclaimed in Proclamation 3394.

We have noted, too, plaintiffs' contention that the President's authority under section 350 (as amended) was circumscribed since "the escape clause statute is a more specific provision than the general powers delegated to the President under section 350 * * *." However this "relative specificity" argument is refuted by House Report 1761, *supra*, which makes it clear that Congress intended that notwithstanding the availability of escape clause procedures the President could still negotiate increases in duty. Plaintiffs cite United States v. Guy W. Capps, Inc., 204 F.2d 655 (4th Cir. 1953), aff'd, 348 U.S. 296, 75 S.Ct. 326, 99 L.Ed. 329 (1955); and United States v. Best Foods, Inc., 47 CCPA 163, C.A.D. 751 (1960). We find that these cases are not pertinent to the present issue and require no discussion.

## VI.

Finally, we turn to plaintiffs' argument that Proclamation 3394 is invalid because the President did not include therein the finding of fact required by section 350(a)(1). Of course, in making the requisite finding of fact and issuing a proclamation pursuant to section 350, as amended, the President acted "merely in execution of the act of Congress" in effectuating a legislative policy. Cf. *Hampton, supra,* 276 U.S. at page 411, 48 S.Ct. 352.

Plaintiffs' construction of the statute is, in substance, that the requisite finding must be *made by proclamation.* We disagree. It is only *after* the enabling finding has been made that the President is authorized to enter into foreign trade agreements and "[t]o proclaim such modifications of existing duties * * * as are required or appropriate to carry out any foreign trade agreement that the President has entered into * * *."[12] There is no requirement in the statute that the President shall *enunciate* or *recite* in the proclamation carrying out the agreement that he made the requisite factual finding.

12. Section 350(a)(1)(B) of the Tariff Act of 1930, as amended.

And, of course, this court may not inquire into the existence of the facts calling for the President's action under section 350, as amended. It has long been held that, where Congress has authorized a public officer to take some specific legislative action when in his judgment that action is necessary to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to judicial review. See *Bush, supra,* 310 U.S. at 380, 60 S.Ct. 944, and cases there cited. Moreover, it may be presumed here that the President properly exercised his authority under section 350, as amended.

Consequently, after making the appropriate finding under section 350(a) (1), the President was authorized to enter into a foreign trade agreement and issue Proclamation 3394. The mere fact that the proclamation did not recite the making of the finding does not invalidate such proclamation.

In view of the conclusion we have reached respecting the validity of Presidential Proclamation 3394, we find that the collector assessed the proper rate of duty on the instant bicycles. The protest is overruled, and judgment will be entered accordingly.

RAO, C. J., and FORD, J., concur.