544 F. Supp. 883

United States Cane Sugar Refiners' Association, plaintiff *v.* John R. Block, Secretary of Agriculture, Donald T. Regan, Secretary of the Treasury, William E. Brock, United States Trade Representative, defendants

Court No. 82–5–00643

Bernard Newman, *Judge.*

198

(Decided June 5, 1982)

*Wilmer, Cutler & Pickering (Daniel Marcus, Max O. Truitt, Jr., Daniel K. Mayers* and *William F. Marmon, Jr.,* Esqs., on the briefs) for the plaintiff.

*J. Paul McGrath,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, *Velta A. Melnbrencis,* Assistant Director, Commercial

Litigation Branch and *James R. Walczak,* Esq., Office of General Counsel, U.S. Department of Agriculture, on the brief, for the defendants.

*Italo H. Ablondi, P.C. (F. David Foster, Italo H. Ablondi* and *H. Henning Vent,* Esqs., on the brief), for *Amicus Curiae* United States Sugar Cane and Sugar Beet Producers and United States First Processors of Sugar.

[Oral argument on May 27, 1982 by Daniel Marcus for plaintiff and David M. Cohen for defendants.]

BERNARD NEWMAN, *Judge:*

## Introduction

We are faced in this complex case with legal issues having diverse economic consequences of national and global dimensions which demand an expeditious resolution by the Court.

On May 5, 1982 the President issued Proclamation 4941 (P.P. 4941) imposing import quotas on sugar (Appendix 1 hereto). By an action filed on May 11, 1982 for a declaratory judgment and injunctive relief, the validity of that proclamation is challenged by the plaintiff association, comprising the six major independent refiners of cane sugar in the United States.

Pursuant to rule 65(a) of this Court, plaintiff moved for an order preliminarily enjoining defendants (and all persons acting under their direction) "from applying, invoking or enforcing in any manner or form" the provisions of P.P. 4941. However, following plaintiff's suggestion in its reply brief and rule 65(a)(2), I expedited and consolidated the hearing on the merits with the hearing on May 27, 1982[1] of plaintiff's application for a preliminary injunction.

Defendants have moved to dismiss on the ground that the Court lacks jurisdiction at the present time; that plaintiff lacks standing to bring this action; and that plaintiff has failed to state a claim upon which relief may be granted.

The parties agree that there is no dispute as to the facts, and therefore the Court will deem cross-motions for summary judgment under rule 56 to be pending before the Court.[2]

In support of the within application, plaintiff submitted with its memorandum of points and authorities the affidavits of: (1) Thomas C. Earley, an economist specializing in sweetener markets and policy and Vice President of Schnittker Associates, a Washington-based economic and management consulting firm; (2) I. H. Kempner III, Chairman of the Board of Imperial Sugar Company of Sugar Land, Texas, a member of plaintiff, and processor of raw

---

[1] At the hearing, the Court received in opposition to plaintiff's application (without objection by the parties) an *amicus curiae* brief filed by the United States Sugar Cane and Sugar Beet Producers and the United States First Processors of Sugar. These trade associations appearing as *amici curiae,* covering more than ten states, represent "the vast majority of U.S. sugar beet and sugar cane production and U.S. first processing activities". (Motion, p. 2).

[2] In its reply brief, p. 1, plaintiff states:

"While the May 27, 1982 hearing is on plaintiff's motion for preliminary injunction, the Court may wish to consider the case on the merits at that time, as authorized by Rule 65(a)(2) of this Court. Defendants, by moving to dismiss for failure to state a cause of action and relying on matters outside the pleadings, have effectively moved for summary judgment, *see* Rule 12(c), and our motion for preliminary injunction may be treated as a motion for summary judgment. We believe that there are no factual issues in dispute and that the case is now fully briefed on the merits."

sugar and marketeer of the refined product to commercial users and retail suppliers; (3) William W. Sprague, Jr., President of Savannah Foods & Industries, Inc. of Savannah, Georgia, another member company of plaintiff, and a processor of raw sugar and marketeer of the refined product to commercial users; and (4) John H. Jackson, Professor of Law at the University of Michigan School of Law who was involved with the negotiation of the General Agreement on Tariffs and Trade.

In opposition to plaintiff's application, defendants have submitted an affidavit of Richard A. Smith, Administrator, Foreign Agricultural Service, United States Department of Agriculture.[3]

*Jurisdiction and Standing*

Initially, we dispose of the threshold arguments defendants proffer for closing the gate on plaintiff's case without reaching the merits. In a word, the grounds asserted by defendants are not persuasive.

As noted *supra,* defendants now move to dismiss the action for lack of subject matter jurisdiction, arguing that the action was filed prematurely. More precisely, defendants argue that to obtain judicial review of the validity of P.P. 4941, plaintiff's members must attempt to make an entry of sugar; file a protest against the exclusion of the merchandise from entry in accordance with 19 U.S.C. § 1514; and then after an administrative review and denial of the protest, file an action in this Court—a time consuming procedure.

In essence, defendants' position is that plaintiff may seek judicial review of the validity of the President's proclamation solely in accordance with 28 U.S.C. § 1581(a) after the exhaustion of the administrative remedies specified in 19 U.S.C. §§ 1514 and 1515. Accordingly, defendants contend that this action was filed by plaintiff prematurely since there have been no attempted entries of sugar, no merchandise has been excluded from entry, and no protests have been filed and denied pursuant to sections 1514 and 1515.

Plaintiff, however, has invoked the Court's residual jurisdiction under 28 U.S.C. § 1581(i),[4] arguing that it would be totally inappropriate for the Court to require plaintiff to exhaust its administrative remedies under 19 U.S.C. §§ 1514 and 1515 as a condition precedent to judicial review of the validity of P.P. 4941. I agree.

Under the circumstances presented here, plaintiff is not relegated to section 1581(a) as the sole jurisdictional predicate for judicial review of the contested proclamation. Inasmuch as plaintiff's action contests "quantitative restrictions on the importation of merchandise" (viz, import quotas), section 1581(i) explicitly grants this Court subject matter jurisdiction. Moreover, section 1581(i) does not re-

---

[3] In addition to the foregoing affidavits, the parties submitted a number of documentary exhibits.

[4] Plaintiff does not press the allegation in its complaint (paragraph 3.1) that the Court has jurisdiction under 28 U.S.C. § 1581(h). In any event, I agree with defendants' argument that the instant action does not fall within the purview of the Court's jurisdiction under section 1581(h).

quire the filing and denial of a protest as conditions precedent to the exercise of such jurisdiction. But as observed by Judge Maletz in *Wear Me Apparel Corp.* v. *United States,* 1 CIT 194, Slip Op. 81–22, 511 F. Supp. 814, 817 (1981):

> This does not mean, however, that by invoking the jurisdiction of the court under section 1581(i) the mandate of section 1581(a) requiring the exhaustion of administrative remedies, i.e., the filing and denial of a protest, may thereby be dispensed with. *Save in those circumstances where equity requires otherwise, the exhaustion of administrative remedies is necessary.* See H.R. Rep. No. 96–1235, *supra* at 44; S. Rep. No. 96–466, 96th Cong., 1st Sess. 7 (1979). [Emphasis added.]

See also *Associated Dry Goods Corp.* v. *United States,* 2 CIT 51, Slip Op. 81–70, 521 F. Supp. 473 (1981); *Sanho Collections, Ltd.* v. *Robert E. Chasen, Commissioner of Customs, et al.,* 1 CIT 6, Slip Op. 80–2, 505 F. Supp. 204 (1980).

Relevant here is 28 U.S.C. § 2637(d) which provides that this Court "shall, *where appropriate,* require the exhaustion of administrative remedies" (emphasis added). Plaintiff has clearly shown that exhaustion of administrative remedies would be inappropriate under the facts and circumstances presented here.

It would, in my judgment, be totally unreasonable—indeed, shocking—to require plaintiff's members to attempt to import over-quota sugar simply in order to obtain a protestable exclusion of the merchandise from entry under 19 U.S.C. § 1514 before seeking judicial review of the validity of the proclamation imposing the quota in a suit for injunctive and declaratory relief. Here, the President has issued a proclamation requiring the Customs officials to exclude from entry any sugar in excess of the specified quotas. The Customs officials, who would review a protest claiming that P.P. 4941 is invalid, obviously have no authority to override the presidential proclamation and admit over-quota sugar. Consequently, respecting a ruling on the validity of P.P. 4941, there is no relief which plaintiff may be granted at the administrative level. Under these circumstances, requiring the exhaustion of administrative remedies would be inequitable and an insistence of a useless formality. It is well established that exhaustion of remedies will not be required if administrative review would be futile. This is particularly the case here where the Customs officials are legally foreclosed from granting the relief sought. *Cf. The Montana National Bank of Billings* v. *Yellowstone County of Montana, et al.,* 276 U.S. 499, 505 (1927); and *Aleknagik Natives Ltd.* v. *Andrus,* 648 F. 2d 496, 500 (9th Cir. 1980).

In sum, protestable actions and decisions are subject to administrative review under the procedures specified in 19 U.S.C. §§ 1514 and 1515, and the proper jurisdictional predicate for judicial review of the administrative determination is 28 U.S.C. § 1581(a). Exhaustion of administrative remedies is, of course, a condition precedent

to invoking this Court's jurisdiction under section 1581(a).[5] *Wear Me Apparel Corp., supra.* However, in circumstances where, as here, a party chooses to invoke the Court's residual jurisdiction under section 1581(i), that party must demonstrate that it would be inappropriate for the Court to require the exhaustion of administrative remedies. 28 U.S.C. § 2637(d); *H.R. Rep. No. 96-1235, 96th Cong. 2d Sess. 41* (1980). I find that plaintiff has made the requisite showing, and this action is ripe for judicial review.

We turn next to the issue raised by defendants concerning plaintiff's standing to bring this action. This ground for dismissal of the action warrants but brief discussion.

Plaintiff's members desire either to import or buy imported raw sugar, and have entered into contractual obligations and business relationships which could be disrupted and adversely affected by the quotas established by P.P. 4941. Further, while all users and consumers of an imported product that are the subject of import quotas are to some degree affected by the quantitative import restrictions, plaintiff's members, whose business and livelihood depend upon access to imported sugar, would be especially aggrieved by the implementation of the quotas imposed by the President's action. In view of the foregoing facts, I cannot agree with the government's assertion that plaintiff's members lack standing to seek judicial review of the validity of P.P. 4941 pursuant to 28 U.S.C. § 2631(i).

Defendants have also moved to dismiss this action on the ground that "plaintiff has failed to state a claim as to which relief may be granted because Presidential Proclamation 4941 was promulgated pursuant to valid statutory authority, so that defendants are entitled to judgment as a matter of law". This ground, essentially, raises the issue presented on the merits.

## VALIDITY OF PRESIDENTIAL PROCLAMATION 4941

### I

### *Background*

Presidential Proclamation 4941 of May 5, 1982 establishes country-by-country import quotas on sugar, syrups and molasses ("sugar") as described in items 155.20 and 155.30 of the Tariff Schedules of the United States (TSUS). The proclamation limits the total amount of imported sugar entered, or withdrawn from warehouse for consumption, between May 11, 1982 and June 30, 1982 to 220,000 short tons, raw value. Beginning with the third calendar quarter of 1982, the total amount that may be imported during

---

[5] As noted by the House Judiciary Committee (H.R. Rep. No. 96-1235, 96th Cong., 2d Sess. 44 (1980), U.S. Code Cong. & Admin. News 1980, 7088, 7114): "Under the Customs Courts Act of 1980, the filing and denial of a protest will continue as prerequisites to the commencement of a civil action brought pursuant to proposed section 1581(a)".

each calendar quarter is to be established by the Secretary of Agriculture.

The proclamation recites that it was promulgated under the authority of, *inter alia,* section 201 of the Trade Expansion Act of 1962 and in conformity with headnote 2 of subpart A of part 10 of schedule 1 of the TSUS. Section 201(a), in pertinent part, reads as follows:

> (a) Whenever the President determines that any existing duties or other import restrictions of any foreign country or the United States are unduly burdening and restricting the foreign trade of the United States and that any of the purposes stated in section 1801 of this title will be promoted thereby, the President may—
>
> (1) after June 30, 1962, and before July 1, 1967, enter into trade agreements with foreign countries or instrumentalities thereof; and
>
> (2) proclaim such modification or continuance of any existing duty-free or excise treatment, or such additional import restrictions, as he determines to be required or appropriate to carry out any such trade agreement.

In short, under section 201(a) the President may proclaim the modification or continuance of any existing duty or other import restriction, or such additional import restrictions, as he determines to be required or appropriate to carry out any trade agreement entered into under the authority of that Act.

The trade agreement in question is the Geneva (1967) Protocol of the General Agreement on Tariffs and Trade (GATT), which was entered into by the United States as a result of the "Kennedy Round" of the GATT trade negotiations. The Geneva Protocol contained a specific provision governing the importation of sugar into the United States, viz., Note 1 of Unit A, Chapter 10, Part 1 of Schedule XX; 19 U.S.T., Part II, 1281. That provision was added to the Tariff Schedules of the United States by Presidential Proclamation 3822 of December 16, 1967 (82 Stat. 1455) as headnote 2 of Subpart A of Part 10 of Schedule 1 of the TSUS ("headnote 2."). Proclamation 3822 (paragraph 10) specifically states that its purpose is to implement the Geneva Protocol.

Headnote 2 repeats almost verbatim the provisions governing sugar that are recited in the Geneva Protocol.[6] Essentially, head-

---

[6] Thus, headnote 2 reads:

1. The concessions provided for in prior schedules XX in respect of articles provided for in items 155.20 and 155.30 in this unit shall be effective only during such time as title II of the Sugar Act of 1948 or substantially equivalent legislation is in effect in the United States, whether or not the quotas, or any of them, authorized by such legislation, are being applied or are suspended: *Provided,*

(i) That, if the President of the United States finds that a particular rate not lower than the rate specified in such concessions, limited by a particular quota, may be established for any product provided for in such concessions, which will give due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties, he shall proclaim such rate and such quota limitation, to be effective not later than the 90th day following the termination of the effectiveness of such legislation;

(ii) That any rate and quota limitation so established shall be modified if the President finds and proclaims that such modification is required or appropriate to give effect to the above considerations; and

note 2 provides that the President shall modify the duties and quotas which are applicable to the importation of sugar whenever such modifications are necessary to "give due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties to the General Agreement on Tariffs and Trade."

With the advent of the GATT in 1947, sugar like all other commodities, became subject to the multilateral negotiating sessions (called "rounds") conducted pursuant to the GATT. The original GATT contained no United States concession reducing the most favored nation rate of duty (GATT, October 30, 1947, Sched. XX, Pt. 1 contains no item 501 (sugar), 61 Stat. All, at A1224). However, during the second GATT tariff negotiation (Annecy, 1949), the duty on sugar was included in the United States schedule of most favored nation rate concessions. The most favored nation rate of duty on sugar was reduced and the following note was added to the concession:

> The foregoing items 501 and 502 shall be effective only during such time as Title II of the Sugar Act of 1948 or substantially equivalent legislation is in effect in the United States, whether or not the quotas, or any of them, authorized by such legislation, are being applied or are suspended.

Annecy Protocol, Oct. 10, 1949, Annex A, Sched. XX, pt. I, 64 Stat. B145, at B324.

In the United States schedule of concessions granted in the 1951 (Torquay) GATT negotiations, the substance of the 1949 Note was included in the new sugar concession, coupled with the following provisos:

> *Provided,* That, if the President of the United States finds that a particular rate not lower than the rate specified above, limited by a particular quota, may be established for any product provided for in this item, which will give due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties, he shall proclaim such rate and such quota limitation, to be effective not later than the 90th day following the termination of the effectiveness of such legislation:
>
> *Provided further,* That any rate and quota limitation so established shall be modified if the President finds and proclaims that such modification is required or appropriate to give effect to the above considerations:
>
> *And provided further,* That the provisions of this item preceding this note shall resume full effectiveness, subject to the provisions of this note, if legislation substantially equivalent to Title II of the Sugar Act of 1948 should subsequently become effective.

---

(iii) That the provisions of such concessions shall resume full effectiveness, subject to the provisions of this note, if legislation substantially equivalent to title II of the Sugar Act of 1948 should subsequently become effective. [Footnote omitted.]

Torquay Protocol, Annex A, Sched. XX, pt. I, item 501, 3 U.S.T. 615, at 1171. In 1951, the provisions of the provisos to the Torquay Protocol were made a part of domestic law by the President, in accordance with his authority under section 350 of the Tariff Act of 1930, as amended, by virtue of Proclamation 2929 (June 2, 1951). See 86 T.D. 121, 227 (1951).

During the Kennedy Round of the GATT negotiations, concluded in 1967, no new tariff concessions were made regarding sugar. Nevertheless, a note that followed the Torquay Protocol language very closely was included in the United States schedule of concessions. As explained above, the almost identical language of this note was added to the TSUS as headnote 2 in 1967 by Proclamation 3822. headnote 2 has since remained in effect and unchanged.

The expiration of the Sugar Act of 1948 left the United States without a comprehensive sugar policy. Since that time, United States sugar policy has been managed through the individual or collective use of several different authorities, including headnote 2, Titles II and III of the Agricultural Act of 1949 (7 U.S.C. 1421, *et seq.*), and section 22 of the Agricultural Adjustment Act of 1933, (7 U.S.C. 624) ("section 22"). Further, the International Sugar Agreement, 1977 (31 U.S.T. 5135) was ratified by the United States, and implementing legislation was passed. International Sugar Agreement, 1977, Implementation Act, Pub. L. 96–236, 94 Stat. 336, 7 U.S.C. 3601, *et seq.*

The expiration in 1974 of the Sugar Act of 1948 activated the obligations of the President as set forth in headnote 2 to proclaim a rate of duty and a quota if he found that such duty and quota would give due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties to the GATT. The President proclaimed a duty and quota by Proclamation 4334 of November 16, 1974 (39 F.R. 40739, Nov. 20, 1974),[7] which since that time, have been modified nine times.

On December 22, 1981 Congress enacted a price support program for sugar in the Agriculture and Food Act of 1981 (Title IX, Pub. L. 97–98, 95 Stat. 1213, 1257, Dec. 22, 1981). That Act amended Title II of the Agricultural Act of 1949 (7 U.S.C. § 1446(h)) to require the Secretary of Agriculture to support the price of sugar processed between December 22, 1981 and March 31, 1982 through a price support purchase program; and also requires that sugar of the 1982 through 1985 crops be supported through a loan program effective October 1, 1982.

Under the purchase agreement program, now in effect, a processor of sugar beets or sugarcane may enter into a purchase agree-

---

[7] Had the President failed to act within 90 days, as required by headnote 2, the rate of duty would have "snapped back" to the non-concessional statutory rate of 1.9875 cents per lb. (100 degree basis).

ment with the Commodity Credit Corporation ("CCC").[8] The purchase agreement, which is analogous to an options contract, provides that the processor may, in his discretion, deliver eligible sugar to the CCC on November 1, 1982. According to the Smith affidavit submitted by defendant (paragraph 8d), the potential expenditures by the CCC under such program would exceed $300,000,000.00 as of May 12, 1982.[9]

Turning now to section 22 of the Agricultural Adjustment Act:

Section 22 authorizes the President to impose fees (limited to 50 percent ad valorem) or quotas on imported commodities upon a finding that such importations may interfere with any price support operations being conducted by the Department of Agriculture.

Briefly, section 22 actions are initiated by the Secretary of Agriculture, who must first inform the President that he has reason to believe that imports are interfering with or threatening to interfere with a price support program. If the President agrees with such belief, he may follow either of two courses of action: First, the President may refer the matter to the International Trade Commission (ITC) for an investigation and defer action until the ITC has issued its report and recommendations; or in the alternative, the President may take emergency action immediately, if the situation so warrants. In such latter cases, the matter is simultaneously referred to the ITC which in due course issues its findings and recommendations.[10] The President, then, may issue a final section 22 proclamation, which may retain, modify, or terminate the emergency action previously taken.

Import fees on sugar have been imposed under the authority of section 22 continuously since November 11, 1977. Since then, the section 22 import fee system has been modified several times. These actions can be summarized as follows:

### CHRONOLOGY OF SECTION 22 ACTIONS

| Date | Proclamation No. | Action |
|---|---|---|
| Nov. 11, 1977 | 4538 | Emergency proclamation establishing a flat fee |
| Jan. 20, 1978 | 4547 | Emergency proclamation modifying fees then in effect |

---

[8] The Commodity Credit Corporation, a governmental agency operating within the Department of Agriculture, is the primary agency through which the Department of Agriculture makes price support available to producers of agricultural commodities. See the Commodity Credit Corporation Charter Act, 15 U.S.C. § 714b, *et seq.*

[9] Smith avers that as of May 12, 1982 various processors had entered into 19 purchase agreements for over 850,000 tons of sugar.

[10] As recently as May 19, 1982, the ITC voted to find that sugar imports were interfering with the operation of the domestic price support program. The ITC is scheduled to transmit its formal recommendations to the President by June 7, 1982. It should be observed that under the terms of the statute the President is not bound by the findings and recommendations of the ITC.

| Date | Proclamation No. | Action |
|------|------------------|--------|
| Apr. 1978 | | ITC issued findings and recommendations |
| Dec. 28, 1978 | 4631 | Final proclamation establishing a quarterly adjusted fee system |
| Dec. 23, 1981 | 4887 | Emergency proclamation establishing a modified quarterly adjusted fee system |
| May 5, 1982 | 4940 | Emergency proclamation modifying quarterly adjusted fee system |

It should be noted that section 22 fees and headnote 2 quotas have been in effect concurrently since 1977.

At the time the Agriculture and Food Act of 1981 became law, the support levels[11] mandated for sugar were substantially in excess of the world price for sugar, which at the time was hovering in the 12–13 cent range (Smith affidavit, paragraph 4). Hence, actions to restrain imports were taken almost immediately by the President. See Proclamations 4887 and 4888 of December 23, 1981, which raised the import duties and fees on sugar.

Since December 1981, and especially during April and May of 1982, the world price of sugar has dropped precipitously. It is now approximately 8 cents per pound. (Smith affidavit, paragraph 6). Because of the further decline in world sugar prices, the President again took action on May 5, 1982. See Proclamations 4940 and 4941 of May 5, 1982, which adjusted the import fee system and imposed quarterly country-by-country import quotas, respectively. The import fees imposed under Proclamation 4940 are now at such levels that no significant increase may be effectuated consistent with the 50 per cent ad valorem limitation provided in section 22.

On May 5, 1982, a statement was issued by the President concurrently with P.P. 4941. (See Addendum II.) Plaintiff relies heavily upon the President's statement to support its argument that, while the purpose of the sugar import quotas imposed by P.P. 4941 is to protect the sugar price support program, "the sole legitimate purpose for import quotas imposed by the President in conformity with headnote 2 is to carry out the terms of a trade agreement entered into pursuant to section 201(a)(1) of the Trade Expansion Act of 1962".

---

[11] The support level under the purchase program, expressed in cents per pound of raw sugar, is 16.75 cents, f.o.b., mill basis. This translates into a New York domestic spot price of 19–20 cents per pound. (Smith affidavit, paragraph 2.)

## II

### *Opinion*

#### A

The issue on the merits is whether the President could validly impose the subject import quotas on sugar pursuant to section 201 of the Trade Expansion Act of 1962 in conformity with Headnote 2 while import fees on sugar were in effect under section 22 of the Agricultural Adjustment Act, as amended.

In *United States* v. *The Best Foods, Inc.,* 47 CCPA 163, C.A.D. 751 (1960), the Court of Customs and Patent Appeals held that under section 22, the President may impose fees *or* quotas, but not both. Stated differently, the disjunctive *"or"* was construed not to mean the conjunctive *"and".*

Defendants do not question the holding in *Best Foods* that the President is barred from imposing both import fees and quotas under the authority of section 22. However, the government maintains that, quite apart from his limited authority under section 22, the President could impose import quotas (whether or not import fees are already in effect) under section 201 of the Trade Expansion Act of 1962 in conformity with headnote 2.[12]

Plaintiff argues that P.P. 4941 is invalid because:

1. Although section 201 authorizes the President to impose import restrictions for the purpose of carrying out any trade agreement, P.P. 4941 does not effectuate any trade agreement and is contrary to both the International Sugar Agreement and the General Agreement on Tariffs and Trade;

2. P.P. 4941 was issued to prevent interference with the sugar price support program established by the 1981 Act, *i.e.,* to eliminate the risk that the Commodity Credit Corporation would be required to acquire sugar under the terms of the price support program established by the 1981 Act. Since section 22 of the Agricultural Adjustment Act of 1933, as amended, is the sole authority for measures intended to protect the interest of the Government in avoiding its obligation to purchase sugar under the price support program, and since the fees imposed pursuant to a prior Presidential proclamation are now at such levels that little or no further increases may be made consistently with the 50% ad valorem limitation provided in section 22, Proclamation 4941 was issued in an effort to unlawfully circumvent the limitations of section 22 on the power of the President.

---

[12] Under 3 U.S.C. § 301, also cited in P.P. 4941, the President was authorized to redelegate certain powers to cabinet-level officials. P.P. 4941 delegates certain powers to the Secretary of Agriculture and the United States Trade Representative.

## B

We first consider plaintiff's contention that P.P. 4941 is invalid because it does not effectuate any trade agreement.

As noted, *supra,* in P.P. 4941 the President relies, not on section 22, but on section 201 of the Trade Expansion Act of 1962 and the International Sugar Agreement Implementation Act, 7 U.S.C. § 3601.[13] Section 201(a)(2) of the Trade Expansion Act authorizes the President, relative to trade agreements entered into between July 1, 1962 and July 1, 1967, to "proclaim such modification or continuance of any existing duty or other import restriction, such continuance of existing duty-free or excise treatment, or such additional import restrictions, as he determines to be required or appropriate to carry out any such trade agreement". The proclamation states in paragraph 3 that the quotas are "appropriate to carry out the trade agreement described in paragraph 2 of this proclamation and the International Sugar Agreement, 1977 (31 Pt. II U.S.T. 5135, T.I.A.S. No. 9664)."

The trade agreement mentioned in paragraph 2 of the proclamation is the Geneva Protocol (June 30, 1967) to the General Agreement on Tariffs and Trade (GATT). The specific part of the Geneva Protocol implemented by Proclamation 4941 is Note 1 of Unit A, Chapter 10, Part I of Schedule XX, 19 Pt. II U.S.T. 1282, T.I.A.S. No. 6425.

As previously mentioned, "Note 1" in the Geneva Protocol, which Proclamation 4941 implements, is almost identical to a provision in the Torquay Protocol to GATT, April 21, 1951, 3 Pt. I U.S.T. 1171, T.I.A.S. No. 2420.

In accordance with the negotiating authority contained in section 201, the United States participated in extensive multilateral trade negotiations, familiarly known as the "Kennedy Round", under the auspices of the GATT. The results of the Kennedy Round of Trade and Tariff Negotiations were implemented by Presidential Proclamation 3822 of December 16, 1967. As part of the negotiations, the United States granted certain concessions and received others. The results of the negotiations were incorporated in a trade agreement which contained the "Note" on sugar.

It appears that a provision similar to the "Note" on sugar contained in the Torquay Protocol has been a part of international agreements to which the United States is a party since 1949. The provision was made a part of United States law by the President, first pursuant to his powers under section 350 of the Tariff Act of 1930, as amended (Proclamation 2929), then pursuant to his powers under section 201 of the Trade Agreements Act of 1962. The provision, as promulgated by the President pursuant to this authority, is now located in headnote 2.

---

[13] The Proclamation also cites 3 U.S.C. § 301, which authorizes the President to delegate authority to other officials of the Executive Branch.

The Sugar Act of 1948 remained in effect until 1974. No substantially similar legislation was thereafter enacted by the Congress. Thus, on November 16, 1974 and prior to the expiration of the 90-day period specified in headnote 2, the President established both a duty and a quota for sugar under the authority contained in headnote 2, by Presidential Proclamation 4334. A quota on sugar has remained in effect since that date.

Consequently, when on May 5, 1982 the President issued P.P. 4941, he did not establish a quota pursuant to headnote 2 for the first time. Rather, he merely modified a quota which had been in effect under headnote 2 since 1974.[14]

The short of the matter is that the President clearly possessed the authority to issue P.P. 4941. Pursuant to section 201, the President had the authority to invoke and proclaim the Note on sugar contained in the Kennedy Round concessions when he deemed it appropriate to carry out the negotiated provisions under the Kennedy Round. The sugar Note was and is an integral part of the Kennedy Round negotiations and the ensuing agreements, and when the President imposed quotas in accordance with the Note, he carried out the terms of the 1967 agreements which he was authorized to do under section 201.

## C

We next consider plaintiff's argument that in issuing P.P. 4941, the President acted to avoid government expenditures under the price support program for sugar, but that the proclamation was barred by section 22 of the Agricultural Adjustment Act, as amended (since import fees had previously been imposed),[15] the only statute authorizing the President to restrict imports for the purpose of protecting price support programs.

Plaintiff contends that in section 22, Congress has enacted a specific, detailed and precise statute for effectuating its policy of protecting the sugar price support program, and that this specific provision prevails over more general provisions, such as section 201, and cannot be circumvented by resort to the latter more general provisions.

Defendants insist that, as recognized by the Courts, the President may possess alternative and independent statutory bases for imposing duties or import restrictions, and that section 201, in conformity with headnote 2, provided the President with authority for imposing quotas by P.P. 4941 independent of his authority under section 22. More, defendant maintains that "Congress has not only known of and acquiesced in the use of different statutory bases (section 201 and section 22) for imposing duties, fees and/or import

---

[14] Subparagraph (ii) of paragraph 1 of headnote 2 authorizes the President to modify the quotas established pursuant to the headnote.

[15] As noted, *supra*, under section 22, the President may impose fees *or* quotas, but not both; and at the time P.P. 4941 was issued, import fees were already in effect.

quotas with regard to imports, but has expressed its specific intent that both bases be used in protecting the sugar price support system".

Plaintiff's position, essentially, is that section 22 is the only statutory authority under which the President could have lawfully imposed the subject quotas.[16] But the Courts have recognized that the President may have alternative statutory bases for taking action. *CF. Aimcee Wholesale Corp.* v. *United States,* 60 CCPA 1, C.A.D. 1070, 468 F. 2d 202 (1972), *aff'g.* 66 Cust. Ct. 155, C.D. 4186 (1971). Additionally, the Senate Finance Committee recognized the two systems of control (section 22 and headnote 2) which have been used regarding sugar imports in its report on the bill which ultimately became the International Sugar Agreement, 1977, Implementation Act (7 U.S.C. § 3601, *et seq.*). See Report No. 96–644, 96th Cong., 2d Sess. (March 26, 1980), at p. 5. I find that the statutory bases for imposing import restrictions under section 22 and section 201 (in conformity with headnote 2) are compatible and complement each other, as the executive branch has construed them.

As aptly observed by Chief Judge Re in his recent decision, *Bar Zel Expediters, Inc., a/c Ben Clements & Sons, Inc.* v. *United States,* 3 CIT 84, Slip Op. 82–25 (1982):

> It is pertinent that there is a long history in the field of international commerce for Congress to delegate power to the President to carry out legislative policy. See *J. J. Hampton, Jr. & Co.* v. *United States,* 276 U.S. 394 (1928); *Field* v. *Clark,* 143 U.S. 649 (1892), and the discussion of those and other relevant cases in *Star-Kist Foods, Inc.* v. *United States,* 47 CCPA 52, 56–58, C.A.D. 728 (1959). In *United States* v. *Yoshida International, Inc.,* 63 CCPA 15, 22, C.A.D. 1160, 526 F. 2d 560 (1975), the Court of Customs and Patent Appeals observed that "Congress, beginning as early as 1794 and continuing into [the Trade Act of] 1974 has delegated the exercise of much of the power to regulate foreign commerce to the Executive." * * * [T]his court, therefore, must accord appropriate deference to Presidential action which finds authority in specific statutes. In the recent case of *Zenith Radio Corp.* v. *United States,* 437 U.S. 443 (1978), in which the Supreme Court upheld a determination by the Treasury Department that a remission of a certain Japanese tax was not a bounty or grant within the purview of section 303 of the Tariff Act of 1930, as amended, the court, quoting *Udall* v. *Tallman,* 380 U.S. 1, 16 (1965), stated: "When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.

My conclusion that the President's quota authority under section 201 is entirely consistent with his authority under section 22 is reinforced by the legislative history of the Agriculture and Food Act

---

[16] As previously indicated, the President was precluded from imposing quotas under the authority of section 22 because import fees were already in effect.

of 1981. Such history demonstrates that Congress intended that the President would use section 201 (in conformity with headnote 2) in order to prevent the outlay of Government funds for the sugar price and loan support program established by Section 901. This is amply demonstrated by the following statement in Senate Report No. 97–126, 97th Cong., 1st Sess. at 106 (May 27, 1981):

> The Committee encourages the President to exercise in a timely fashion his authorities under headnote 2 of Subpart 10(A), Schedule I, Tariff Schedules to the United States and section 22 of the Agricultural Adjustment Act to impose duties, fees or quotas on imports of foreign sugar. Judicious and expeditious use of such authorities by the President could avoid the adverse budgetary consequences of situations where the market price for sugar falls below the price objective and loan level specified under the Government sugar program.

Inasmuch as the two statutory bases are not inconsistent, but complementary, the cases relied upon by plaintiff are inapposite for the proposition that in case of inconsistent provisions the more general must yield. None of the cases cited involve a situation where, as here, Congress has demonstrated its intent that both section 22 and section 201 be used for restricting imports. In this connection, it may be noted that under analogous circumstances in *Aimcee Wholesale Corp.* this Court rejected the plaintiff's "relative specificity" argument.[17] See 66 Cust. Ct. at 171.

In the final analysis, plaintiff's complaint concerning P.P. 4941 is the President's avowed motive to defend the domestic sugar price support program, as plainly enunciated in his statement of May 5, 1982. Fundamentally, however, if the President's action is authorized by the statutes relied upon, the judiciary may not properly inquire or probe into the President's reasoning or into the existence of the facts calling for the action taken. *United States* v. *George S. Bush & Co., Inc.,* 310 U.S. 371 (1939).

Moreover, as the Supreme Court said in *Bush* (310 U.S. at 379), the President's method of solving the problem was "not open to scrutiny" by the Courts; and further, in such instances, when the action is authorized, the President's "judgment * * * is determinative".

It may also be noted that in determining the validity of the President's proclamation in *Aimcee Wholesale Corp.,* this Court was not persuaded that the President's proclamation was invalid because of the reasons for his action. See 66 Cust. Ct. at 169.

### D

Plaintiff also urges that P.P. 4941 is contrary to the GATT. That contention is without merit. Trade concessions under GATT are not limited to tariff reductions and have traditionally covered quantita-

---

[17] In any event, headnote 2 relates specifically to sugar whereas section 22 is a general authority.

tive restrictions and non-tariff barriers. Concessions often include provisions regarding quotas as well as tariffs. In point of fact, contrary to plaintiff's contention that the Geneva Protocol was negotiated solely pursuant to tariff authority in Article XXVIIIb (bis), the final act of that Protocol notes that negotiations were conducted pursuant to Article XXVIII (bis) "and other relevant provisions of the General Agreement * * * on tariffs and non-tariff barriers." 19 Part I, U.S.T. 5. GATT concessions on sugar since 1949 have recognized U.S. import quotas on sugar. And significantly too, Congress has also acknowledged and relied on this long-standing GATT recognition. House Ways and Means Committee Report No. 95–1484, Part II, 95th Cong., 2d Sess. 33–35.

Moreover, plaintiff's contention that the quotas are inconsisitent with the International Sugar Agreement (ISA) is similarly untenable. Article 58 of the ISA requires a developed importing member only to "adopt such measures compatible with its domestic legislation as it deems appropriate to its own circumstances" to ensure access to its markets. Article 58 obviously does not prohibit the United States from maintaining or imposing restrictions on imports. Additionally, plaintiff is incorrect in the statement that "(t)he only restrictions on importation [in the ISA] are against the importation of sugar which has been exported in violation of the Agreement." On the contrary, Article 57 of the ISA requires that when the world price falls below a certain level, importing members of the ISA are to limit their imports from non-members.

E

Concluding, after careful consideration of the excellent briefs and oral arguments of counsel for the respective parties and the brief submitted by *amicus curiae,* I have determined that although the President may not lawfully impose both fees and quotas under the authority of section 22, I nevertheless must agree with the government's position that the import quotas at issue fall within the President's authority under section 201 in conformity with headnote 2, and therefore P.P. 4941 is valid.

While I appreciate the unfortunate adverse economic consequences of the quotas for plaintiff's members and sympathize with their plight, I must sustain the President's proclamation and deny plaintiff the relief it seeks.

Accordingly, it is hereby ordered:

1. That defendant's motion to dismiss for lack of jurisdiction and lack of standing by plaintiff to bring this action is denied;

2. That plaintiff's application for declaratory and injunctive relief is denied;

3. That plaintiff's motion for summary judgment is denied;

4. That defendant's cross-motion for summary judgment is granted.

Consolidation of the hearing on the application for a preliminary injunction with trial on the merits having been ordered by the Court on May 27, 1982, the foregoing constitutes the Court's Findings of Fact and Conclusions of Law pursuant to rule 52(a).

## Appendix I

**Presidential Documents**

*Proclamation 4941 of May 5, 1982*

MODIFICATION OF QUOTAS ON CERTAIN SUGARS, SIRUPS AND MOLASSES

By the President of the United States of America

A Proclamation

1. Headnote 2 of subpart A of part 10 of schedule 1 of the Tariff Schedules of the United States (19 U.S.C. 1202), hereinafter referred to as the "TSUS", provides, in relevant part, as follows:

"(i) . . . if the President finds that a particular rate not lower than such January 1, 1968, rate, limited by a particular quota, may be established for any articles provided for in item 155.20 or 155.30, which will give due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties to the General Agreement on Tariffs and Trade, he shall proclaim such particular rate and such quota limitation. . . ."

"(ii) . . . any rate and quota limitation so established shall be modified if the President finds and proclaims that such modification is required or appropriate to give effect to the above considerations: . . ."

2. Headnote 2 was added to the TSUS by Proclamation No. 3822 of December 16, 1967 (82 Stat. 1455) to carry out a provision in the Geneva (1967) Protocol of the General Agreement on Tariffs and Trade (Note 1 of Unit A, Chapter 10, Part 1 of Schedule XX; 19 U.S.T., Part II, 1282). The Geneva Protocol is a trade agreement that was entered into and proclaimed pursuant to section 201(a) of the Trade Expansion Act of 1962 (19 U.S.C. 1821(a)). Section 201(a) of the Trade Expansion Act authorizes the President to proclaim the modification or continuance of any existing duty or other import restriction or such additional import restrictions as he determines to be required or appropriate to carry out any trade agreement entered into under the authority of that Act.

3. I find that the quantitative limitations hereinafter proclaimed are appropriate to carry out the trade agreement described in paragraph 2 of this proclamation and the International Sugar Agreement, 1977 (31 U.S.T. 5135), and give due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties to the General Agreement on Tariffs and Trade.

NOW, THEREFORE, I, RONALD REAGAN, President of the United States of America, by the authority vested in me by the Constitution and statutes, including section 201 of the Trade Expansion Act of 1962, section 301 of Title 3 of the United States Code, and the International Sugar Agreement, 1977, Implementation Act (P.L. 96-236, 94 Stat. 336), and in conformity with headnote 2 of subpart A of part 10 of schedule 1 of the TSUS, do hereby proclaim until otherwise superseded by law:

A. Headnote 3 of subpart A, part 10, schedule 1 of the TSUS is modified to provide as follows:

3. (a) The total amount of sugars, sirups, and molasses described in items 155.20 and 155.30, the products of all foreign countries, entered, or withdrawn from warehouse for consumption, between May 11, 1982 and June 30, 1982, inclusive, shall not exceed, in the aggregate, 220,000 short tons, raw value.

(b) Beginning with the third calendar quarter of 1982, the Secretary of Agriculture (hereafter the Secretary) shall establish for each calendar quarter the total amount (expressed in terms of raw value) of sugars, sirups, and molasses described in items 155.20 and 155.30, the products of all foreign countries, which may be entered, or withdrawn from warehouse for consumption, during such calendar quarter. The Secretary shall determine such amount, inform the Secretary of the Treasury of his determination, and file notice thereof with the Federal Register no later than the 15th day of the month immediately preceding the calendar quarter during which such determination shall be in effect. In determining such amounts the Secretary shall give due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties to the General Agreement on Tariffs and Trade.

(c) The total amounts of sugars, sirups, and molasses permitted to be imported under paragraphs (a) and (b) of this headnote shall be allocated to the following supplying countries or areas in the following percentages:

| Country | Percentage | Country | Percentage |
|---|---|---|---|
| 1. Canada | 1.1 | 13. Ecuador | 1.1 |
| 2. Guatemala | 4.8 | 14. Peru | 4.1 |
| 3. Belize | 1.1 | 15. Brazil | 14.5 |
| 4. El Salvador | 2.6 | 16. Argentina | 4.3 |
| 5. Honduras | 1.0 | 17. Thailand | 1.4 |
| 6. Nicaragua | 2.1 | 18. Philippines | 13.5 |
| 7. Costa Rica | 1.5 | 19. Taiwan | 1.2 |
| 8. Panama | 2.9 | 20. Australia | 8.3 |
| 9. Jamaica | 1.1 | 21. Mauritius | 1.1 |
| 10. Dominican Republic | 17.6 | 22. Mozambique | 1.3 |
| 11. Colombia | 2.4 | 23. Rep. S. Africa | 2.3 |
| 12. Guyana | 1.2 | | |

| Country | Per-centage | Country | Per-centage |
|---|---|---|---|
| 24. Swaziland | 1.6 | and areas. | |
| 25. Other specified countries | 5.9 | Total | 100.0 |

The category "Other specified countries and areas" shall consist of the following: Mexico, Haiti, Barbados, Trinidad-Tobago, Bolivia, Paraguay, France, India, Anguilla, Antigua, Dominica, Grenada, Saint Lucia, Saint Vincent and the Grenadines, Montserrat, Saint Christopher-Nevis, British Virgin Islands, Fiji, Tonga, Nauru, Malagasy Republic, Zimbabwe and Malawi.

Notwithstanding the allocation provisions set forth above, the Secretary may, after consultation with the U.S. Trade Representative, the Department of State, and the Department of the Treasury, issue regulations modifying the allocation provisions governing "Other specified countries and areas" if the Secretary determines that such modifications are appropriate to provide such countries and areas reasonable access to the United States sugar market. Such regulations may, among other things, provide for the establishment of minimum quota amounts, the establishment of quota periods other than quarterly periods,′ and the carrying forward of unused quota amounts into subsequent quota periods.

(d) The Secretary, after consultation with the U.S. Trade Representative and the Department of State, may suspend the allocation provisions of paragraph (c), or may establish quantitative limitations for periods of time other than calendar quarters as provided in paragraph (b), if the Secretary determines that such action or actions are appropriate to give due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties to the General Agreement on Tariffs and Trade. The Secretary may reinstate the allocation provisions of paragraph (c), or may amend any quantitative limitations (including the time period for which such limitations are applicable) which have previously been established under this paragraph or paragraph (b), if the Secretary determines that the considerations set forth in the previous sentence so warrant. The Secretary shall inform the Secretary of the Treasury of any determination made under this paragraph. Notice of such determinations shall be filed with the Federal Register, and such determinations shall not become effective until the day following the date of filing of such notice or such later date as may be specified by the Secretary.

(e) The U.S. Trade Representative or his designee, after consultation with the Department of Agriculture and the Department of State, may modify the allocation provisions of paragraph (c) (including the deletion or addition of any country or

area), and may prescribe further rules, limitations or prohibitions on the entry of sugar if he finds that such actions are appropriate to carry out the obligations of the United States under the International Sugar Agreement, 1977, or any successor agreement thereto, and that such actions give due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties to the General Agreement on Tariffs and Trade. If the U.S. Trade Representative takes any such action, he shall so inform the Secretary of the Treasury and the Secretary of Agriculture and shall publish notice thereof in the Federal Register. Such action shall not become effective until the day following the date of filing of such notice or such later date as may be specified by the U.S. Trade Representative.

(f) The Secretary shall, in consultation with the U.S. Trade Representative, the Department of State, and other concerned agencies, review the operation of this headnote prior to September 1 of each year. In making such review, the Secretary shall determine whether the continued operation of pargraphs (b), (c), (d), and (e) of this headnote gives due consideration to the interests in the Untied States sugar market of domestic producers and materially affected contracting parties to the General Agreement on Tariffs and Trade, and whether the operation of paragraph (g) of this headnote would give due consideration to such interests. The Secretary shall file a notice of such determinations in the Federal Register no later than September 1 of each year. If the Secretary determines that the continued operation of paragraphs (b), (c), (d), and (e) of this headnote would not give due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties to the General Agreement on Tariffs and Trade, and that the provisions of pargraph (g) of this headnote would give due consideration to such interests paragraphs (b), (c), (d), and (e) of this headnote shall terminate as of the first day of October following such determinations.

(g) If paragraphs (b), (c), (d), and (e) of this headnote are terminated under the provisions of paragraph (f) of this headnote, the total amount of sugars, sirups, and molasses described in items 155.20 and 155.30, the products of all foreign countries, entered, or withdrawn from warehouse for consumption, in any fiscal (October 1–September 30) year shall not exceed, in the aggregate, 6,900,000 short tons, raw value. The U.S. Trade Representative or his designee may allocate this quantity among supplying countries or areas, and may prescribe further rules, regulations, limitations or prohibitions on the entry of sugar· in accordance with the International Sugar Agreement; 1977, and Public Law 96–236. The U.S. Trade Representative or his designee shall inform the Commissioner of Customs of any such action regarding the importation of sugar, and shall publish notice thereof in the Federal Register.

(h) For the purposes of this headnote, the term *"raw value"* means the equivalent of such articles in terms of ordinary commercial raw sugar testing 96 degrees by the polariscope as de-

termined in accordance with regulations issued by the Secretary of the Treasury. Such regulations may, among other things, provide: (1) for the entry of such articles pending a final determination of polarity; and (2) that positive or negative adjustments for differences in preliminary and final raw values be made in the same or succeeding quota periods. The principal grades and types of sugar shall be translated into terms of raw value in the following manner:

(i) For articles described in item 155.20, by multiplying the number of pounds thereof by the greater of 0.93, or 1.07 less 0.0175 for each degree of polarization under 100 degrees (and fractions of a degree in proportion).

(ii) For articles described in item 155.30, by multiplying the number of pounds of the total sugars thereof (the sum of the sucrose and reducing or invert sugars) by 1.07.

(iii) The Secretary of the Treasury shall establish methods for translating sugar into terms of raw value for any special grade or type of sugar for which he determines that the raw value cannot be measured adequately under the above provisions.

B. Those parts of Proclamation 4334 of November 16, 1974, Proclamation 4610 of November 30, 1978, Proclamation 4663 of May 24, 1979, and Proclamation 4770 of July 1, 1980, which are inconsistent with the provisions of paragraph (A) above, are hereby terminated.

C. The provisions of this Proclamation shall be effective as of May 11, 1982. However, the quantitative limitations imposed by paragraphs (a) and (c) of headnote 3 of subpart A, part 10, schedule 1 of the TSUS, as modified herein, shall not apply to articles entered, or withdrawn from warehouse for consumption, prior to July 1, 1982, which are exported (as defined in section 152.1 of the Customs Regulations) on a through bill of lading to the United States from the country of origin prior to April 23, 1982.

IN WITNESS WHEREOF, I have hereunto set my hand this 5th day of May, in the year of our Lord nineteen hundred and eighty-two, and of the Independence of the United States of America the two hundred and sixth.

RONALD REAGAN.

Appendix II

THE WHITE HOUSE
*Office of the Press Secretary*

For Immediate Release.
May 5, 1982.

### Statement by the President

I have today proclaimed an emergency import quota program to manage sugar imports into the U.S. market.

This action is necessary to defend the domestic sugar support program mandated by Congress last year and prevent massive imports which could displace domestic sugar and require the

U.S. government to purchase sugar at a cost of up to $400 million. The action is precipitated by our inability to defend the domestic program with duties and fees alone in view of a continued sharp drop in the world sugar price, now below 9 cents a pound. The world price has fallen 30 percent in four months in the face of a prospectively large world crop.

The Administration has taken a number of steps to maintain the domestic price of sugar since the enactment of the price support program by Congress in December. On December 23, I proclaimed an import system, including import duties and fees, under authority of Section 22 of the Agricultural Adjustment Act of 1933 as amended. On April 1, import fees were adjusted upward, based on a 20-day world average price of 11.69 cents for late February and early March. On April 23, import fees were increased by an additional 1 cent.

The ability to use import fees under Section 22 is limited, however, by a statutory restriction on the level of fee that can be applied. At present depressed world prices, this level is inadequate to prevent imports from coming into the domestic market at a price below the domestic support price mandated by current law.

The quotas will be applied nondiscriminatorily on an historical basis. The Presidential proclamation will provide for quotas to be apportioned among exporting countries according to percentage performance of those countries in 1975–1981, a period during which no restrictive quotas were in effect. Each country's high and low years will be excluded in order to assure a fair and representative allocation of quotas.

The size of the total quota will be determined and announced quarterly by the Secretary of Agriculture. The present import duty of 2.8 cents a pound, raw basis, will be continued. The Section 22 import fees will be continued but will be adjusted as our domestic price responds to the quota.

The objective is to defend the domestic price support program by creating a market situation that will enable U.S. beet and cane producers to sell in the market rather than forefeiting their production to the Commodity Credit Corporation. The interests of foreign suppliers are also protected since this system provides such suppliers reasonable access to a stable, higher priced U.S. market.

In arriving at this decision, we have taken fully into account the Caribbean Basin Initiative. The historical formula chosen to allocate quotas among countries fully reflects the traditional role of Caribbean Basin countries in our sugar market.

In separate action, steps are also being taken to provide Caribbean Basin sugar producers with additional financial assistance during the remainder of this year beyond that already proposed in the Caribbean Basin Initiative legislation and normal budget requests.